United States District Court
Southern District of Texas

**ENTERED**

April 20, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANGELA GARCIA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-1760 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant's Cross-Motion for Summary Judgment (Doc. 13) and Plaintiff's Motion for Summary Judgment (Docs. 18, 20). The court has considered the motions, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **DENIED,** that Plaintiff's motions be **GRANTED** in part, and that this matter be **REMANDED** to the Commissioner for further consideration of Plaintiff's medical evidence in conformity with this opinion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for supplemental security income

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 8.

("SSI") benefits under Title XVI of the Social Security Act ("the Act").

## A.   <u>Factual History</u>

Plaintiff was born on November 21, 1991, and was nineteen years old when she protectively applied for disability benefits on March 2, 2011, claiming an inability to work due to physical limitations imposed by spina bifida.[2]  In her application, she claimed she became disabled at birth.[3]  The relevant period for determining Plaintiff's disability status is the period from March 2, 2011, through the date of the ALJ's decision.[4]

## B. <u>Medical History</u>

The medical record shows that Plaintiff underwent a significant number of surgeries and procedures as a result of spina bifida.  Because the court does not fully rely on Plaintiff's early medical condition and operations, it briefly summarizes Plaintiff's voluminous medical records.

At birth, it was noted that Plaintiff suffered from moderately

---

[2]     <u>See</u> Tr. of the Admin. Proceedings ("Tr.") 152.

[3]     <u>Id.</u>

[4]     The claimant cannot receive payment for SSI for any time prior to the application, regardless of the length of the disability. 20 C.F.R. § 416.335; <u>Brown v. Apfel</u>, 192 F.3d 492, 495 n.1 (5th Cir.1999).

severe hydrocephalus[5] and Arnold-Chiari brain malformation.[6]  She
was hospitalized from December 1991 through February 1992 as a
result of bladder and kidney issues, meningitis, esophagitis, vocal
paralysis, tracheotomy and ventricular shunt status.[7]  Plaintiff's
mother testified that as an infant, Plaintiff underwent surgery on
her spine and a shunt was placed in her brain.[8]  As a toddler,
Plaintiff had surgery on her eyes to correct cross-sightedness and
had another surgery on her back to address a tethered spinal cord.[9]

In March 1993, a magnetic resonance imaging ("MRI") of
Plaintiff's cervical spine showed spinal dysraphism[10] with Chiari
brain malformation, status post-ventricular shunting and
suboccipital decompression.[11]  Plaintiff was noted to have a shunt
malfunction and recurrent hydrocephalus and underwent corrective
surgery.[12] In April 1993, Plaintiff underwent a laryngoscopy to

---

[5]    Hydrocephalus is a condition characterized by the abnormal
accumulation of cerebrospinal fluid, usually under increased pressure, within the
cranial vault.  Mosby's Pocket Dict. of Med., Nursing & Allied Health
("Mosby's") 434 (1st ed. 1990).

[6]    Tr. 1368.  The Arnold-Chiari malformation is a congenital herniation
of the brainstem and lower cerebellum through the foramen magnum into the
cervical vertebral canal.  Mosby's at 73.

[7]    See Tr. 21.

[8]    Tr. 65.

[9]    See Tr. 66-67.

[10]   Dysraphia is present when there is a failure of a raphe to fuse
completely, as in the incomplete closure of the neural tube.  Mosby's at 299.

[11]   See Tr. 1311.

[12]   See id.

address a recurring issue with bilateral vocal cord paralysis.[13]

In August 1993, a renal ultrasound showed a mild dilation of the left renal pelvis and normal relative growth of the kidneys.[14] Later that year, in November 1993, Plaintiff was hospitalized for a week for a urinary tract infection that was treated with intravenous antibiotic therapy.[15]   In August 1994, Plaintiff underwent surgery for an upper airway obstruction.[16]   In July 1995, Plaintiff was diagnosed with a neurogenic bladder.[17]

Scans in March 1996, January 1998 and January 1999, continued to confirm that Plaintiff had a spinal dysraphic defect with low cord and evidence of tethering, a Chiari II malformation and a thin thoracic hydromyelia.[18]

In April 2001, Plaintiff underwent eye muscle surgery for overactive exterior oblique muscles.[19]   An August 2004 renal scan was found to be normal, with normal interval growth of both kidneys noted.[20]

---

[13]     See Tr. 2184-86.

[14]     See Tr. 1308.

[15]     See Tr. 1606-07.

[16]     See Tr. 1417-19.

[17]     See Tr. 1299.  A neurogenic bladder's nerves fail to work with the bladder muscles to control the retention and release of urine.  Mosby's at 606.

[18]     See Tr. 1407, 1422, 1444,

[19]     See Tr. 1241.  This was to correct bilateral esotropia, commonly known as cross-sightedness.

[20]     See Tr. 1270.

In July 2007, Plaintiff was seen by a urologist, Eric A. Jones, M.D. ("Dr. Jones") for evaluation of her neurogenic bladder. Dr. Jones recorded that Plaintiff catheterized herself and was "largely dry during the daytime."[21] He also noted that Plaintiff managed her bowels with suppositories and rarely had accidents.[22] She was found to have a reasonable capacity bladder at 800 cubic centimeters.[23] Dr. Jones concluded that Plaintiff was doing "quite well from a urologic standpoint," and continued her prescription for Ditropan XL, administered daily.[24] Plaintiff was told to return to the clinic in a year.[25]

In September 2007, Jacob Weinberg, M.D., ("Dr. Weinberg") was consulted about a deformity in Plaintiff's left foot and her walking on the lateral border of the foot, both with and without her leg braces.[26] Dr. Weinberg found that Plaintiff had a pistol group deformity in her right foot, but could bring that foot to neutral.[27]  In contrast, Plaintiff's left foot had a varus deformity, and the forefoot was found to be slightly adducted.[28]

---

[21]   Tr. 1206.

[22]   Id.

[23]   See id.

[24]   Id.

[25]   See id.

[26]   See Tr. 1203.

[27]   See id.

[28]   See id.

5

Dr. Weinberg also found that the left posterior tibialis tendon to be tight and that there was no active strength in the gastrocnemius muscle.[29]  Dr. Weinberg noted that he intended to consult with other doctors about whether a cord lengthening was a better choice than a calcaneal flat osteotomy to address these issues.[30]  At a follow-up visit in February 2008, Dr. Weinberg recorded that Plaintiff experienced improvement since her last visit and did not need surgery.[31]

On October 29, 2008, Plaintiff returned to Dr. Jones for a follow-up visit for her neurogenic bladder.[32]  He recorded that Plaintiff maintained a stable catheterization regimen, and, although she was scheduled to catheterize herself four times per day, she rarely catheterized herself more than three times per day.[33]  Plaintiff reported no wetting episodes as long as she kept up with the catheterization schedule and took Ditropan as prescribed.[34]  Dr. Jones noted that Plaintiff had bowel movements four to five times per week and had no problems with stool incontinence.[35]

---

[29]  See id.

[30]  Id.

[31]  Tr. 1189.

[32]  See Tr. 1184.

[33]  Id.

[34]  See id.

[35]  Id.

One year later, Dr. Jones found Plaintiff's neurogenic bladder to be unchanged, and a renal ultrasound showed that her kidneys and bladder were normal, without hydronephrosis or kidney stones.[36] Dr. Jones commented that Plaintiff had done very well from a urologic standpoint during the prior year.[37] He noted, as he had a year earlier, that Plaintiff rarely catheterized herself more than three times per day without wetting incidents as long as she regularly took her medicine.[38] Plaintiff also reported having bowel movements four to five times per week and had no problems with stool incontinence.[39] Plaintiff was advised to catheterize herself four times daily and to take the prescribed medication.[40]

In August 2010, Plaintiff saw Jose C. Interiano, M.D., ("Dr. Interiano") whom she had been seeing since at least 1999 when he referred Plaintiff to John P. Laurent, M.D., for a pediatric neurosurgical consultation.[41] Dr. Interiano's notes from the August 2010 appointment are mostly illegible except for the mention of some type of ulcer.[42] In March 2011, Dr. Interiano wrote a letter

---

[36]    See Tr. 1180.  Hydronephrosis is present when there is an obstruction in the ureter.  Mosby's at 435.

[37]    Tr. 1179.

[38]    Id.

[39]    Id.

[40]    See id.

[41]    See Tr. 1141-43, 1146.

[42]    See Tr. 1146.

7

describing Plaintiff's condition, stating that Plaintiff had spina bifida, which was diagnosed at birth.

> As a consequence of this condition she has developed hydrocephalus requiring a ventricular peritoneal shunt. Also she has serious gait disturbances due to the faulty innervations to her lower extremities that require her to use braces for support. Another complication that [Plaintiff] has is a neurogenic bladder, condition that requires intermittent bladder catheterizations. [Plaintiff] has been followed by different specialists at Texas Children's Hospital and will continue to be monitored for these problems through her life.[43]

In October 2010, Plaintiff saw Kevin Horowitz, M.D., ("Dr. Horowitz") in connection with a broken left leg brace.[44] Dr. Horowitz found that she had a healing scar of her right shin caused by her leg brace rubbing her skin and a Trendelenburg gait to the right.[45] Dr. Horowitz noted that Plaintiff was unable to dorsiflex her left foot and had no plantar flexion bilterally.[46] Dr. Horowitz concluded that Plaintiff would continue to benefit from leg braces.[47]

On June 12, 2012, Plaintiff saw Angelina Ayoola, M.D., ("Dr. Ayoola") at N.W. Houston Family Practice, P.A.[48] Dr. Ayoola conducted a physical examination and found that Plaintiff had a

---

[43]   Tr. 1172.

[44]   See Tr. 1154.

[45]   See id.

[46]   Id.

[47]   See Tr. 1155.

[48]   See Tr. 1220-25.

past history of spina bifida, neurogenic bladder, foot deformities, fecal incontinence, and musculoskeletal deformities.[49]   Pertinent to the present appeal, Dr. Ayoola noted that Plaintiff occasionally found her urine to have a bad odor but never pursued it to determine if a urinary tract infection could be the cause.[50] Plaintiff reported pain in both shoulders, occasional neck pain, and hip pain due to asymmetry in the alignment of her hips.[51]   No progressive lumbar weakness or parasthesia was noted by Dr. Ayoola.[52]   Plaintiff was continued on medication to address the neurogenic bladder.[53]

**C.**   **Application for Benefits/Administrative History**

On March 11, 2011, Plaintiff applied for SSI benefits, claiming a disability based on spina bifida.[54]   Plaintiff disclosed that she completed high school in 2011 and had never worked.[55] Plaintiff claimed that her spina bifida limited her ability to work because she had limited abilities to stand, walk and sit.[56]

---

[49]   See Tr. 1220.

[50]   See id.

[51]   See id.

[52]   Id.

[53]   See Tr. 1222.

[54]   Tr. 156.

[55]   Id.

[56]   Tr. 169.

Plaintiff lives at home with her parents.[57] She explained that she needed to shower and dress herself in a seated position and that those activities took approximately two hours to complete.[58] Plaintiff was able to use the toilet for bowel movements with "no problem," but needed to catheterize herself to empty her bladder.[59]

Plaintiff was also able to microwave frozen dinners, do laundry and light house cleaning.[60] Plaintiff was able to shop twice a month for several hours but was unable to drive.[61] Plaintiff was able to watch television, listen to music, play video games, and she regularly went on family visits and attended church.[62] Although Plaintiff required braces to ambulate, she estimated that she could walk one mile before needing to rest for five minutes.[63]

On April 28, 2011, Plaintiff underwent a consultative examination by Tanveer Syed, M.D., ("Dr. Syed") in connection with her application for SSI benefits.[64] Plaintiff reported that, as an infant, she had suffered grand mal seizures which resolved after a

---

[57]    See Tr. 193.

[58]    Tr. 170.

[59]    Id.

[60]    See Tr. 171.

[61]    See Tr. 172.

[62]    See Tr. 173.

[63]    Tr. 174, 176.

[64]    See Tr. 1157.

shunt was implanted in her brain.[65]   Plaintiff explained that
because of an unstable gait, atrophy, and poor development of the
muscles in her legs, she wore bilateral braces to prevent foot
drop.[66]   Dr. Syed noted that Plaintiff had surgeries to correct
spina bifida, two surgeries to correct strabismus and a surgery to
release a tethered cord from scar tissue.[67]

    Plaintiff was also found to have a neurogenic bladder, which
required that she catheterize herself four times per day.[68]
Plaintiff disclosed that she had experienced bladder spasms in the
past and frequent episodes of urinary incontinence but that
medication had proved effective in reducing those instances.[69]
Plaintiff reported that she also had experienced recurrent urinary
tract infections but not in the recent past.[70]   Plaintiff stated
that she also had experienced severe constipation in the past but
that condition had improved after consuming a high fiber diet and
she now had spontaneous bowel movements every third day and rarely
had bowel incontinence.[71]

    After a physical examination, Dr. Syed found that Plaintiff

---

[65]   Id.

[66]   Id.

[67]   Id.

[68]   See id.

[69]   Id.

[70]   Id.

[71]   Id.

had 4/5 strength in her flexor extensors of the ankle and decreased muscle tone in her legs.[72] She had poorly developed tendons, small femurs and ankylosis of both ankles.[73] She had a spastic, unstable, waddling gait with mild ataxia and no dysmetria.[74] She could handle objects in both hands without difficulty and was able to write.[75] She was unable to bend, squat, or touch her toes and walked with difficulty for approximately fifteen yards with the assistance of leg braces and support from her mother.[76]

Based on this physical examination and other information in Plaintiff's file, on May 2, 2011, Patricia Rowley, M.D., ("Dr. Rowley") determined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, could stand/walk two hours in an eight-hour workday, sit about six hours in an eight-hour workday and had an unlimited ability to push and pull.[77] Plaintiff was also found to have the ability to occasionally climb stairs, balance, stoop, kneel, crouch and crawl, and never to climb a ladder or scaffolding.[78]   Plaintiff was found to have no

---

[72]   See Id.

[73]   See id.

[74]   See Tr. 1160.

[75]   See id.

[76]   Id.

[77]   See Tr. 1165.

[78]   See Tr. 1166.

manipulative, visual, communicative or environmental limitations.[79]

On May 2, 2011, the Commissioner denied Plaintiff's application for benefits, and Plaintiff moved for reconsideration.[80] Shabnam Rehman, M.D., ("Dr. Rehman") reviewed Dr. Rowley's determination and concurred with her determination that, although Plaintiff experienced gait difficulty and could not sustain prolonged ambulation or standing, Plaintiff did not use an assistive device and did not demonstrate ineffective ambulation.[81]

Reconsideration was denied on September 13, 2011, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on September 23, 2011.[82]   The ALJ granted Plaintiff's request and, on September 5, 2012, heard testimony concerning Plaintiff's limitations.[83]

**D.   ALJ Hearing**

Plaintiff, her mother and a vocational expert ("VE") testified at the hearing.[84]   Plaintiff was represented by an attorney.[85]

Plaintiff testified that she was twenty years old and lived

---

[79]      See Tr. 1167-68.

[80]      See Tr. 96-97.

[81]      See Tr. 1173.

[82]      See Tr. 101.

[83]      See Tr. 36.

[84]      See Tr. 37.

[85]      See Tr. 38.

with her parents.[86]  She graduated from high school where she had attended special education classes.[87]  She stated that she was presently taking two classes at Lone Star College and that her parents drove her to school because she could not drive.[88]

Plaintiff testified that while she could sit "for a pretty long time," she could not walk "very far" or lift "very much."[89] Plaintiff was unable to stand, walk or balance without her leg braces; consequently, it took her about an hour and a half to shower and dress herself.[90]  Plaintiff explained that she presently took Oxybutynin to aid in bladder control.[91]   Plaintiff also testified that she catheterized herself four times per day and that it took fifteen to twenty minutes each time.[92]  Even when taking Oxybutynin as directed, Plaintiff still experienced accidental leakages of urine.[93]  Plaintiff estimated that she had urine incontinence "pretty much quite often," and at times, "it

---

[86]    Tr. 42.

[87]    See Tr. 43.  Plaintiff explained that as part of her individual education plan, she received test accommodations, such as paring down the number of choices in a multiple choice test.  Tr. 60.

[88]    Tr. 43, 47.

[89]    Tr. 47.

[90]    See Tr. 48, 56.

[91]    Tr. 45.

[92]    Tr. 56–57.

[93]    See Tr. 58.

happen[ed] every day."[94]   When that occurred at school, she called
her mother to assist her in cleaning herself, and the clean up
process might take up to thirty minutes.[95]   Plaintiff also related
that her eyesight was very weak, and she could not see without
glasses.[96]

Gloria Garcia ("Mrs. Garcia"), Plaintiff's mother, estimated
that her daughter had had eleven surgeries over the years to
address conditions associated with spina bifida.[97]   She explained
that as a result of the spina bifida and surgeries, Plaintiff was
at least two to three years behind her grade level academically and
graduated from high school under an Admission, Review and Dismissal
("ARD") protocol wherein Plaintiff obtained accommodations in
testing and comprehension.[98]

Mrs. Garcia testified that Plaintiff suffered from fecal
incontinence requiring her to go to the school to pick up
Plaintiff, take her home and clean her in the bathtub.[99]   Mrs.
Garcia explained that these accidents were very unpredictable, some
days there were no accidents and other days there could be as many

---

[94]   Id.

[95]   See Tr. 58-59.

[96]   Tr. 62.

[97]   See Tr. 65.

[98]   Tr. 67, 69.

[99]   Tr.74-75.

as three.[100]   Also, if Plaintiff did not regularly catheterize herself, she would have urine leakage.[101]

Mrs. Garcia testified that Plaintiff's ankles were paralyzed, and she had difficulty walking and balancing.[102]   She did not believe that Plaintiff could live on her own.[103]   Mrs. Garcia also explained that her daughter was taking remedial basic courses at Lone Star College and that she failed the math class.[104]

The ALJ asked the VE whether a hypothetical individual who had a high school education in special education with some college work currently, could sit six hours in an eight-hour day, stand and walk two hours in an eight-hour day, lift ten pounds occasionally and five pounds frequently, with unlimited push/pull, except for occasional pushing with the lower extremities, bilaterally, and requiring a voiding break every four hours would be able to find jobs in the regional or national economy.[105]   The VE testified that this hypothetical individual could find sedentary, unskilled work as a document preparer, call-out operator, or optical goods worker.[106]   When asked by Plaintiff's counsel if the hypothetical

---

[100]   Tr. 72.

[101]   See id.

[102]   Tr. 73-74.

[103]   See Tr. 75.

[104]   Id.

[105]   Tr. 77.

[106]   Tr. 78.

individual would be able to find jobs if she also required three, twenty-minute unscheduled breaks in an eight-hour work day, the VE answered in the negative.[107]   The VE also testified that if the hypothetical individual could not stand for more than thirty minutes during the eight-hour day or would have to go home for one to two hours once a week to change clothing due to incontinence issues, those limitations would render the person unemployable.[108]

E.   **Commissioner's Decision**

On November 8, 2012, the ALJ issued an unfavorable decision.[109] The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 2, 2011, and that Plaintiff had multiple severe impairments: spina bifida, urinary incontinence, and obesity.[110]   The ALJ found that Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any of the listings of the regulations (the "Listings").[111]

The ALJ first evaluated Plaintiff's spina bifida under Listing 11.08.[112]   That Listing, addressing spinal cord or nerve root lesions due to any cause, requires significant and persistent

---

[107]    Id.

[108]    Tr. 79.

[109]    See Tr. 16-35.

[110]    See Tr. 21.

[111]    See Tr. 25-26.  The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. §§ 416.920(d), 416.925, 416.926.

[112]    See Tr. 25.

17

disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.[113]   The ALJ found, without explanation, Plaintiff's spina bifida did not meet this Listing.[114]

The ALJ then considered whether Plaintiff's obesity imposed any cumulative limiting effect on her impairments.[115]   The ALJ found that Plaintiff's obesity was not severe enough, either singly or in combination with her other impairments, to meet or equal any Listing.[116]

Considering the record, the ALJ found that, while Plaintiff may have experienced some of the symptoms alleged, the degree of her symptoms and limitations were not supported by objective evidence.[117]   In particular, the ALJ noted that Plaintiff had gone for a year without treatment for spina bifida and was attending college classes two nights per week.[118]   Additionally, the ALJ found that Plaintiff's bladder impairment to be adequately controlled with medication and reasonable voiding periods and cited Plaintiff's most recent doctor visit when she had told Dr. Ayoola

---

[113]   See id.

[114]   See id.

[115]   See Tr. 26.

[116]   See id.

[117]   See Tr. 27.

[118]   Id.

that she was doing well.[119] The ALJ noted that, at the visit, Plaintiff's strength and muscle tone were found to be five out of five, and neurologically, Plaintiff's sensations and her deep tendon reflexes were found to be normal.[120]

The ALJ afforded minimal weight to Dr. Horowitz's opinion that Plaintiff had limited ankle dorsiflexion and would benefit from the continued use of leg braces. The ALJ also afforded little weight to the opinion of Jose C. Interiano, M.D., ("Dr. Interiano") that Plaintiff had a serious gait disturbance as a result of "faulty interventions to her lower extremities" that required braces for support.[121]

The ALJ also favorably cited a doctor visit from October 2009 where Plaintiff's neurogenic bladder symptoms were found to be under control and an ultrasound showed her kidneys and bladder to be normal.[122] The ALJ expressly discredited Plaintiff's mother's testimony concerning Plaintiff's physical limitations and episodes of incontinence, noting that it was inconsistent with the medical records and even Plaintiff's own testimony.[123]

The ALJ also discounted Dr. Rowley's determination of

---

[119]   See Tr. 28.

[120]   Id.

[121]   Tr. 29.

[122]   See Tr. 28.

[123]   See id.

Plaintiff's residual functional capacity ("RFC") and instead limited Plaintiff to sedentary work with non-exertional limitations of only occasionally pushing with her lower extremities, balancing, stooping, crouching, crawling, bending, twisting and no squatting, climbing stairs, ladders, ropes, scaffolds or running.[124]  The ALJ also excluded Plaintiff from heights, dangerous machinery, and uneven surfaces and required a voiding break every four hours.[125]  In so finding, the ALJ concurred with Dr. Rehman's opinion that, although Plaintiff required braces to walk, she did not use an assistive device and did not demonstrate ineffective ambulation.[126]

The ALJ found that Plaintiff had no past relevant work, but found that Plaintiff would be able to perform sedentary, unskilled jobs.[127]  The ALJ found that such jobs, including document preparer, call out operator and optical goods worker, were available in the regional and national economy.[128]  Thus, the ALJ found that Plaintiff had not been under a disability from March 2, 2011, through the date of the ALJ's decision.[129]

Plaintiff appealed the ALJ's decision, and, on April 8, 2014,

---

[124]    See Tr. 26, 29.

[125]    See Tr. 29.

[126]    See id.

[127]    See Tr. 30.

[128]    See id.

[129]    See Tr. 30-31.

the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[130]   After receiving the Appeals Council's denial, Plaintiff timely sought judicial review of the decision by this court.[131]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by

---

[130]    See Tr. 1-4.

[131]    See Doc. 1, Pl.'s Compl.

"medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3); see also 42 U.S.C. § 423(d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner

has the responsibility of deciding any conflict in the evidence. <u>Id.</u> If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. <u>Id.</u>

### III. Analysis

In her motion for summary judgment, Plaintiff argues that the ALJ erred by: (1) finding that her impairments did not meet or equal Listing 11.08; (2) failing to properly consider the medical source opinions of Plaintiff's physicians; and (3) failing to credit the hearing testimony of Plaintiff and her mother. Defendant contends that the decision is legal correct and support by substantial evidence.

### A. <u>Listing 11.08</u>

23

The Listings separate disorders of the musculoskeletal system that cause lower-extremity weakness, sensory changes, bladder or bowel incontinence from disorders of the neurological system that also may result in similar conditions, such as spina bifida.  See Listing 1.00K(4).  Musculoskeletal impairments are evaluated under Listing 1.00 et seq., and neurological impairments are evaluated under Listing 11.00 et seq.  See Listings 1.00B, 1.00E(2), 1.00K(4).  Functional loss related to musculoskeletal impairments "is defined as the inability to ambulate effectively on a sustained basis for any reason," while functional loss related to neurological impairments is defined as "disorganization of motor function."  Listings 1.00B(2)(a), 11.00C.

Listing 11.08 applies to impairments meeting two elements: (1) evidence of spinal cord or nerve root lesions due to any cause; and (2) disorganization of motor function.  Listing 11.08 refers to Listing 11.04B for the description of the second element, which expounds "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  Listing 11.04B refers to 11.00C, which indicates that "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances [any or all]. . . frequently provide[] the sole or partial basis for decision in cases of neurological impairment."  Whether it does "depends on the degree of

24

interference with locomotion and/or interference with the use of fingers, hands, and arms."  Listing 11.00C.

Here, the ALJ correctly considered Plaintiff's diagnosis of spina bifida under Listing 11.08, instead of under the Listings for musculoskeletal impairments.[132]  However, in explaining his reasons for determining that Plaintiff's impairments did not meet or equal the Listing, the ALJ offered one sentence: "Plaintiff does not have disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait, and station."[133]  This perfunctory statement merely recites the second element of Listing 11.08 without citing any evidence or making explicit findings.  The ALJ erred in failing to discuss the evidence to explain why he found Plaintiff did not meet Listing 11.08.  See Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007).

The Audler court found an ALJ's discussion of the third step of analysis inadequate where the ALJ failed to identify the Listing(s) considered or to provide any explanation as to why the claimant's impairments failed to meet or equal the Listing(s).  See id.  The court endorsed the Tenth Circuit's view that "[s]uch a bare conclusion is beyond meaningful judicial review."  Id. (quoting Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996)).  Citing the Act itself, the court held that the ALJ "was required to

---

[132]   See Tr. 25.

[133]   Id.

discuss the evidence offered in support" of the claim for disability and to explain why the ALJ found the claimant was not disabled at that step. Id. "Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step." Id. As a result, the Fifth Circuit continued, it "simply [could not] tell whether her decision [was] based on substantial evidence or not." Id. (quoting Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986)).

Here, the court is also left wondering whether the ALJ, in fact, properly considered the medical evidence and based his decision on substantial evidence. Even though the ALJ identified the applicable Listing, he provided rote recitation of one of the requirements in lieu of any analysis or medical expert testimony as to whether Plaintiff's medical evidence indicated that her impairment met or equaled the Listing. The ALJ erred in failing to provide more.

This error alone, however, does not warrant reversal. As frequently recognized in this circuit, "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" Id. (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)). The court must apply a harmless error analysis in evaluating the effects of the ALJ's failure to consider certain evidence. Id.

Harmless error exists when there is no possibility that the ALJ would have reached a different conclusion absent the error. Bornette v. Barnhart, 466 F. Supp.2d 811, 816 (E.D. Tex. 2006)(citing Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003)).

That cannot be said here.  Having scoured the record, the court found nothing in the medical record to indicate that Plaintiff does not have significant and persistent disorganization of motor function in her legs, resulting in sustained disturbance of her gait and station.[134]   Neither the preliminary nor the reconsideration decision specifically mentions the consideration of any Listing.[135]   Dr. Rowley did not discuss the Listings in her Physical RFC Assessment.[136]  The case assessment by Dr. Rehman also failed to mention the consideration of any Listing.[137]  Even though Dr. Rehman acknowledged that Plaintiff had gait difficulty and could not sustain prolonged ambulation and standing, he concluded that she did not demonstrate "ineffective ambulation," the language of the requirements for the inapplicable musculoskeletal Listings.[138]

---

[134]   Both the ALJ and Dr. Rowley both remarked that Plaintiff said she can walk about a mile before needing a five-minute break.  See Tr. 1171.  Plaintiff's testimony is not medical evidence.

[135]   See Tr. 83, 97.

[136]   See Tr. 1164-71.

[137]   See Tr. 1173.

[138]   See id.

On the other hand, one of Plaintiff's long-term treating physicians and the Social Security Administration's consultative examiner provided evidence in support of a finding that Plaintiff met Listing 11.08. Dr. Interiano stated in March 2011 that Plaintiff suffered "serious gait disturbances due to the faulty innervations to her lower extremities that require her to use braces for support."[139] Another example of medical evidence supporting a finding of disorganization of motor function is the April 2011 description of Plaintiff's gait by the Social Security Administration's consultative examiner: "[G]ait is waddling with[] mild ataxia."[140] He further explained, Plaintiff "walked about 15 yards from the Elevator to the Clinic to come in with help of her bilateral lower extremity braces which prevent foot drop and some help from her mother who brought her in."[141] He also noted that Plaintiff was unable to perform heel and toe or tandem walking.

The ALJ erred in failing to provide sufficient evidentiary support and reasoning to support his determination that Plaintiff did not meet or equal Listing 11.08 and that error caused Plaintiff substantial harm. Therefore, the ALJ's decision must be vacated and remanded for further consideration and possible review by a medical examiner, should the ALJ find the latter to be necessary.

---

[139]   Tr. 1172.

[140]   Tr. 1160.

[141]   Id.

Because of the court's decision on this issue, the court need not consider Plaintiff's other arguments.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **DENIED** and that Plaintiff's motion be **GRANTED** in part. It is **RECOMMENDED** that this action be **REMANDED** for further consideration in light of this opinion.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 20th day of April, 2016.

U.S. MAGISTRATE JUDGE